Good morning, Your Honors, and may it please the Court, I am Roy Petty, Counsel for the Appellants, and I am here today with Co-Counsel Barry Martinez. Your Honors, as to our claim for expungement, and I know that we've made several claims in our complaint and we've raised several issues in our brief, but as to our claim for expungement, the District Court found that the appellant had established a continuous, ongoing injury that potentially could be remedied by expungement. The Court, however, denied that remedy by finding that forensic search of the appellant's iPhone was constitutionally invalid. Your Honors, there are three separate ways in which the government violated the appellant's Fourth Amendment rights. The first regards the border search exception. In that case, the manner that the cell phone was searched was contrary to the Supreme Court decisions in Ramsey and Flores-Montano. On those two cases, the Supreme Court said that the border search exception is grounded in protecting the entry into the United States of unwanted persons and preventing the entry into the U.S. of unwanted effects. And the search in this case was untethered from those governmental interests of preventing entry of persons and effects into the United States. The reasonable inference from the evidence is that the appellant was stopped and the iPhone was seized to learn how the immigration attorney would apply for a visa from the U.S. State Department for a person of interest. We argue that at page five of the brief. The second violation is that the government... That first argument is you're disputing that there was reasonable suspicion that your client had connections to an arms trafficker. You dispute that. That is correct, Judge, but we also don't believe that reasonable suspicion as to a connection with an arms trafficker is sufficient under Ramsey or Flores-Montano to cause a border search. And the reason why is those cases address individualized suspicion. Assuming that there was a connection, which there was not, the search really didn't do anything to advance those two governmental interests of preventing the unwanted entry into the U.S. of individuals or effects. The reason why, Your Honor, is that the appellant is a U.S. citizen. He has a right to enter the United States. Certainly the law would be very different for non-citizens. And secondly, there is no allegation that somehow the appellant was trying to do anything that was inappropriate. Simply, he was just the attorney for a person who happened to have the same name as an individual whom the government believed was engaging in arms dealing. And of course, there's no crime against engaging in arms dealing. There are certainly plenty of companies that engage in arms dealing, such as Remington and Colt. As to the second issue, and we believe that this... That's kind of a housekeeping question. You want, tell me if I'm wrong, you want DHS to delete the data, right? That is correct, Judge. DHS tells us that they want to delete the data, but they can't because they say you placed a litigation hold. And you look at the record, and page 57, you placed a litigation hold on the search and all further seizure and review of all data, unquote. So tell me if this is wrong. It seems that this case is the only thing stopping you from getting the relief that you want. And why are we here? That is not correct, Judge. Procedural posture of the case. This lawsuit was filed shortly after the seizure of the iPhone, but before the iPhone was decrypted, and before the contents of the iPhone were disseminated. Now there certainly is an issue, it's a factual issue that's still left up in the air as to whom it was disseminated to. So going directly to your point, the government in its brief argues that CBP, not DHS, but CBP, which is one of the two principal appellees in this case, possesses two forms of media. One is a SanDisk drive, and the other is a Seagate hard drive. But, as we've argued, and as we've cited, there are two other USBs. There's a total of four media devices, and CBP presently claims that it only has two. Now certainly in the government's opposition brief, there was an issue as to whether they are claiming that those other two USBs were destroyed. But looking at the evidence that they point to, which is the response to the interrogatories, that has nothing to do with two USBs. What they were talking about in those interrogatories regarding information that was destroyed references what could be, for example, cached information on a computer, or a file saved on a computer. But our position is, and it's proven by the evidence, that there are four media devices, and the government says that it only has two. So the question... Let's get back to Judge Willard's question. You sent a message, an e-mail or something to the government saying, don't search it, don't review it. Did you also say, don't destroy it? No, sir, we did not. And that, we sent that e-mail prior to our being aware of any kind of a decryption of that data. Now, the other issue which we think, well, Judge, if I can follow up on your question, we believe that certainly, that if proceedings are remanded back to the district court, and if we are able to get discovery on the issues raised and widened, and there's an evidentiary reason for that as well, Judge. If we find out that, no, that the information was not disseminated outside of CBP, such as the government claims in its brief, and if we find out that the information was not disseminated to DHS, which is the district court, I expect that we very likely will settle this at district court. But the problem is, we find four media, and they claim two. Moving to the merits, then. Let's assume the lawsuit and the communications didn't create a self-inflicted injury. You're saying that there was an unreasonable search at what point, when they sent it to the lab, or when they sent it to the filter team, or even at the outset when they seized the phone? At the outset when they seized the phone, because the government's justifications, which were permitted by the Supreme Court of preventing unwanted entry of persons and effects into the United States, was not the justification of the search. Here, the justification of the search has been tethered from those two Supreme Court decisions. The justification of the search was to learn information about how this other person was going to use his attorney to try to get a visa to come to the U.S., which we believe is... The unreasonableness was trying to get at the confidential data inside it, as opposed to pursuing their reasonable suspicion that it was, that your client was an arms trafficker? There is no allegation that my client was an arms trafficker. The allegation is that my client, sorry, that the appellant had a client whom the government believed was an arms trafficker. My client was never accused of doing anything wrong. The district court cites several Fifth Circuit cases saying all that's necessary to get into a cell phone at the border is reasonable suspicion. And that is the problem, Judge. The court does not say reasonable suspicion of what? If you look at the precedent from other circuits that address reasonable suspicion, that would be reasonable suspicion that the cell phone contains evidence of a crime, evidence of a crime that's individualized, that's related to the traveler, to the person who possesses that phone. And that was not the case here, because the attorney was not accused of doing anything improperly. It's just that the government wanted to see how the attorney would use the legal process to try to get a visa. And I might add that CBP is not in charge of visas. It's the U.S. Department of State that issues visas. So certainly the U.S. Department of State could take the position that we would be happy to grant a visa to this individual, and there's not really much that CBP can do about that, because that's not their jurisdiction. Visas are the jurisdictions of the U.S. State Department. But, Judge, what we believe is even more troubling is that the government broadened the scope of the search beyond the border by allowing the iPhone to download confidential data from remote servers for two hours. And on page 11 of our brief, we cite to our expert. And if you extrapolate the information provided by the expert, the download of data for the two hours is the equivalent of 119 printed pages. And, Judge, certainly there is nothing in the law that would permit CBP or DHS to use the cell phone as some kind of a trap and trace or some kind of a wire device to essentially allow CBP to hold onto a cell phone and to download data to the border from remote servers. This argument I saw in the reply brief, I didn't really see it in the principle brief. Judge, we did make that argument throughout the principle brief. And in our reply brief, we cited. The first place I went was the table of authorities. I didn't see that Riley was even cited. I think Riley is cited once. But this, oh, it was searched forensically in Houston, that argument emerges more in the reply brief, or am I wrong? Judge, the argument does emerge more in the reply brief. But throughout our opening brief, we cite to the fact of this two-hour download. We cite to the information of the expert. We cite to the fact that Riley, which we believe Riley squarely says that you can't take the data without any kind of a warrant. And that really has nothing to do with the border issues. That's not a case of bringing Riley to the border. That's just a case of applying the decision, the holding of Riley to a phone that was taken and used to bring data to the border. You know of any circuit that has said that a phone seized at the border cannot be forensically examined without a warrant? Basically applying Riley to border seizures of phones. The only circuit case that I'm aware of is United States v. IGBECON. And that's a Fourth Circuit case, and we cite to that. And that has to do with the court held that the government lacks sufficient individualized suspicion of criminal activity with a nexus to the government's underlying border search exception. And the court found that the warrantless forensic search of Abbott-Kaban's device violated the Fourth Amendment. And that is because the justification for the search was not tethered to the justification. That would apply if reasonable suspicion were necessary or probable cause. That isn't resolving whether a warrant's necessary. As long as it's reasonable suspicion that the cell phone contains evidence of a crime. Which is the issue that the court, the district court, never reached. But Judge, going back to the issue of the downloads from the cell phone, there certainly is information in Riley that we believe is directly on point here. So in Riley, the government conceded that the search incident to arrest exception may not be stretched to cover a search of files stored in the cloud. The court said that such a search would be like finding a key in a suspect's pocket and arguing that the key allowed law enforcement to unlock and to search the house. The search of the cell phone to draw data to the border, those 119 pages for two hours, is not permitted under the border search exception. It is just simply an information-gathering fact that certainly I don't believe that other law enforcement agencies have regularly used. At least I have found nothing in the case law. I have found no case stating either way whether the government could take a cell phone and whether it could use that cell phone to essentially trap information that's stored remotely and bring that to law enforcement for law enforcement to search through. Judge, the justification for that is explained in Riley, and that is because Riley says the data that a user sees on a cell phone may actually be on a remote server and not on a cell phone. And if this Court were to allow such cell phone searches, this really would be the first circuit that would untether the border search exception from the Supreme Court decisions and the first one that would allow the government to use a cell phone as a trap and trace device or some kind of a device. The District Court said you lacked standing for declaratory relief on two grounds, redressability and injury. Your brief seems to only discuss injury and not redressability. Am I incorrect? As to declaratory relief, it does not address redressability. That is addressed by our Count 12, which is for the injunction. But the request for the declaratory judgment sets up the violation, declares that this action is a violation, and the remedy is handled through Count 12, which is the request for an injunction. Can I see that my time is up? Yes, you've saved time for rebuttal. Thank you. Thank you, Judge. Mr. Stoltz? Thank you, Your Honor, and may it please the Court. I'd like to address the issue of the expungement claim and the standing for that first. As the Court noted, the government has expressed to the District Court and to this Court that the government is ready to destroy the data, and it did not do so strictly because the litigation had been filed and there were document preservation obligations associated with the litigation. Mr. Petty talks about his email where he asked for a litigation hold. I think the email speaks for itself. But even aside from the email, even if that email had never been sent, there were discovery requests made, as shown on page 358 of the record. So there's actually discovery requests to the government. In other words, you need to preserve this data so that you can produce it to us. And just generally speaking, the existence of the litigation creates a reason for the government to say, okay, wait a minute, we can't just destroy all this data. We need to preserve it for purposes of the litigation. Because once it's gone, it's gone, right? That's correct, Your Honor. And that data is the evidence of what was downloaded from the phone, what was on the phone. And I should add, too, that there's a new wrinkle that I've only become recently aware of, which is that Mr. Malik has now filed a second lawsuit relating to this incident. That lawsuit was filed in the District of Columbia District Court, Federal Court in the District of Columbia, and he filed it as an attorney on behalf of his mother, but it all relates to the same incident here of the phone and whether there was information from the phone downloaded. My understanding is Mr. Petty is now involved in that lawsuit as well. So, again, perhaps the, you know, there's additional litigation concerning this that I think right now the government would say needs to put a hold on our ability to delete the data. But as to the search, as to the CBP electronic order directive, there is, from that perspective, the data is ready to be deleted and erased. But if the government has a retention policy, pending a suit that alleges your ongoing seizure is unconstitutional, you're saying the litigant lacks standing to bring that suit? No, I'm not saying that the litigant lacks standing. So there's a case that we cite in our brief called the Abador case, A-B-I-D-O-R, which is a very, very similar case in the government had done an electronic border search. There was a lawsuit. One of the plaintiffs in the lawsuit was the Association of Criminal Defense Attorneys. There were some individual plaintiffs. The government said, look, we did the border search and we, there's nothing that we need to seize from this border search. We're ready to delete it. The only reason we've kept it is because of the litigation and not because of our, you know, border search. And the court says, okay, there's essentially no standing to ask for deletion of the data because deletion of the data isn't, you know, the fact that the data has not yet been deleted is not being caused by the border search. It's not being caused by the CBP's electronic directive. It's being caused just by the litigation. And the court said, now you may have a claim for damages and you can bring that claim and that would give you standing. But in a situation where the government has already essentially looked at the data and is done with it from an operational perspective, the government is ready to delete it. There's just no, there's no causation and there's nothing to essentially be redressed in the sense of we're ready to get rid of the data. Now, I want to move to this issue of, that Mr. Petty mentioned about whether this was tethered to a government interest. And I think the answer is it was an interest at the border. The CBP electronic border search directive, which is in the record and which sort of governs its officers' use of this border search authority, the directive states that to the extent you're going to do a search that requires reasonable suspicion, there needs to be reasonable suspicion of activity in violation of the laws that are enforced or administered by CBP. In other words, these border-related laws. So these laws have to do with, you know, inspecting persons and property that are entering the country. These laws have to do with investigating crime that has some transnational border-crossing element. There's sort of a wide swath of these border-related crimes. But under the agency's own directive, there does need to be a nexus to this sort of border-related crime. And we think, and the district court found, that that was satisfied here. And it was satisfied for a couple of different reasons. So one was the information that CBP had about this arms dealer that was known to have links to the Dallas area. He had traveled out of Dallas. He had been arrested in Pakistan at the airport for attempting to bring arms into the country, apparently from the United States or possibly from England. CBP determined that the person by this name was, this name was linked to companies that were registered to Mr. Malik's office address, so these business entities. Mr. Malik's mother was also listed as a person on these companies. In other words, she was also an officer or a director and had some relationship with these companies that were registered to Mr. Malik's address. So CBP was not, and the record just does not support the notion that CBP had already concluded that this suspected arms dealer was a client of Mr. Malik and they were trying to just pierce that relationship. That is not the case. CBP was just trying to determine what, if any, relationship there was. And that's shown in, you know, the declarations in the, that are in the record. That's shown by the contemporaneous reports that are in the record of this. There's one of them at page 1149 that talks about trying to ascertain the degree of affiliation. So that was one issue, but that was not the only thing that was known to CBP that caused them to want to do this border search. Get back a little for me before you continue diving into the facts. What is the government's position as to when it, in the border, can access a phone? Do you acknowledge that to enter a phone, even using the border search exception, it can't be done suspicionlessly? So the government's position, Your Honor, is it's probably best reflected in the electronic border search directive that CBP has put out to govern what its officers do. And that's in the record at 1109. And very briefly, what that, what that directive says is that to do a so-called basic search of the phone, which is also referred to as a routine search, which refers to simply having the phone in your hand and looking at things that are just evident, you know, that the user can navigate to themselves without looking into deleted files, cached images. A so-called basic search can be done for no reason at all or for any reason. That's a basic search. Now, a search that is considered a forensic search or an advanced search, that kind of search has to have reasonable suspicion under the government's own policies. And the district court said, I think it's in a footnote in the district court's decision, that the CBP policy of requiring reasonable suspicion for the more advanced searches, no suspicion required for the basic search, that policy is consistent with Fifth Circuit law and is, you know, legally the proper, the proper policy. So if... When you say consistent with Fifth Circuit law, when have we ever addressed a forensic search of a phone at the border? Which I'm thinking of as a non-routine one or an advanced one where you're going to send it to El Paso and then it's going to go to Houston and then it's going to go to a filter team, which is what happens here. So days away and hundreds of miles away, that's still considered, that forensic search still can be premised on reasonable suspicion at the border? What Fifth Circuit cases say, what any circuit has said that? I think several circuits have dealt with these type of forensic searches. I think the, well, in the Fifth Circuit, the Molina-Isadora decision, ultimately the court said that there was a good faith, you know, because of the good faith exception. And we don't have that opportunity here. There is no, right, there's no good faith exception. I think all the Fifth Circuit cases have gone off on good faith. What, again, what circuit would you say best reflects the government's argument that to do a forensic search days away in another city, you still can rest on the border search exception that requires only reasonable suspicion? What circuit best articulates that? I think the First Circuit, they have a decision called Al-Asad, A-L-A-S-A-A-D, and I believe that that case is cited by the district court. That court talks about, you know, it's okay to do a routine search without reasonable suspicion and for a non-routine search, which would be the forensic type search, you do not need a warrant or probable cause. In other words, reasonable suspicion is the highest, you know, the highest thing that would possibly be needed. Is that, does that predate Riley or is that post-Riley? That is a post-Riley case, right. So Riley, I believe, was in the 2014 era. So these are all post-Riley cases. And the district court here, I think, cited in a footnote some of the cases that we cited in our brief that talked about, I think there's a United States v. Jarman case where it was an attorney and his phone was seized and the government did a very lengthy forensic analysis of the phone over a long period of time and it took seven or eight months, much longer than here. And the court approved that and said, yes, this is, you know, obviously when there's the possibility of privileged information, these steps need to be taken to protect that information, but it doesn't untether it from the border. And I'd like to say here, too, that, you know, the, you know, the border search exception in both with respect to phones and with respect to, you know, regular items, right, the law understands and recognizes that sometimes you have to take steps to make the thing to be searched accessible, right? So sometimes it's necessary to disassemble a car, you know, a fuel tank that might be suspected of having drugs. Sometimes it's necessary to transport somebody to a medical facility to monitor them if they're, you know, if they're suspected of having swallowed drugs. That's, again, and this is largely informed, and I'm sure you're prepared to discuss it by U.S. versus Smith and Judge Rakoff's careful analysis. There in the stomach of the person or in the car is a thing that's being illegally brought into the country or a person. But Judge Rakoff's point is, in light of Riley, being able to access everything in somebody's phone and everything that's in plain view will go far beyond sort of illegal contraband we're trying to interdict at the border. I understand that, Your Honor, and I think this does get to this distinction between is the border search, is border search authority, can it only be used to detect contraband or can it be used to detect a broader range of things that's not only just contraband but also evidence that's relevant to some sort of crime or suspected criminal activity with a border nexus? Now, the first... You couldn't do a forensic search, anything in plain view, child pornography, anything in that person's life. Well, I think it goes to the question of if you have reasonable suspicion of something with a border nexus, then you can look at it. If you do and you happen to see child pornography, that's no different than any other situation. You might get a warrant for X and you come in and you see child pornography. I think... You might get a warrant, but here the government's saying we don't need a warrant. We don't, yes, that is what we're saying, but assuming that we have reasonable suspicion of something with a nexus to the border. I think that the contraband versus evidence distinction I think is just something that's not been raised in this case. The brief here does not argue that the government's border search exception should be limited to contraband. We think that position's wrong. That Al-Asad case from the First Circuit that I just mentioned goes into that and explains why only allowing for searching for contraband is not the proper scope of the border search. I just don't think that issue's been raised here. There hasn't been an argument that it's limited, but if there was... That issue being the Rakoff issue wasn't raised in the principle... That's correct. That's just not a... The contraband distinction is not relevant here, and even if it was, I think that the border search is broad enough to allow for inspections to develop evidence. And let me give just a very simple explanation or example of that is it's quite common that there's cases where a border search is done and there's papers found, right, and in the papers there's evidence that looks like, oh, this is some sort of drug trafficking. There's a case that we cited in the district court called Fortna, F-O-R-T-N-A. It wasn't cited on appeal because this just really isn't an issue on appeal, but the agents went through and they found papers that showed, you know, airstrips in Mexico, notations about picking up a pilot, arrangements to go to Columbia, and the idea was this is evidence that there's some kind of drug trafficking going on. And the court said that is acceptable, that, you know, looking for that evidence is within the scope of the border search exception. And it was not contraband. It was just stuff written on paper. Well, today, all that same information is very most likely to be on a phone, right? You're going to have text messages about who you're going to meet when you go into the country. And, in fact, in the Molina Isadora case, that was exactly the sort of information that was, you know, looked at on the phone, text messages. We've said, I mean, the Supreme Court and we have said, everyone, reasonable suspicion is very low, right? Pay in cash, one-way ticket, Miami, and you've basically got it. So every American that does that, their phones can be seized in forensic search of it? I guess that's where I'm having some uncertainty. Well, I guess I would say that if there is reasonable suspicion of some border-related  Yep. Pay in cash going through Miami. Reasonable suspicion... I mean, I don't know if the courts have said that that qualifies alone or doesn't. I don't know. I think that there's practical limitations. And many of the cases have discussed this, the idea that there's so many people being processed that there's just, you know, there's no capacity to do that many of these searches. On the reasonable suspicion, too, I want to, I don't want to leave out that the issues with Mr. Malik's brother also formed a backdrop here and contributed to the reasonable suspicion. At page 1132 in the record is notes from the CBP system that flags incoming passengers and they call it the, you can place a lookout on a passenger, meaning you want them to be pulled aside for additional questioning. So this lookout was placed even before Mr. Malik landed at the airport. And in the lookout, they're talking not only about the issue with the possible link to the arms dealer, but also about Mr. Malik's brother, who was on the same flight as Mr. Malik. Mr. Malik's brother was flagged. Mr. Malik's brother's phone was looked at at the time. And this is prior to the time that Mr. Malik's phone was actually detained. They looked at his phone. They found a number of concerning things that we discuss in our brief, including affiliations with the Foreign Intelligence Service, pictures of dead bodies. They see all this on the phone. Mr. Malik's brother, who is a non-citizen, is actually denied, ultimately is denied entry to the country. They won't let him into the country. But in the meantime, there's definitely a lot of, you know, sort of smoke, for lack of a better word, that there's something going on here that requires a little bit more investigation. And Mr. Malik was going to be hosting his brother in the country. Why is the brother trying to enter the country? So this is just all to the more, to the point of reasonable suspicion. Reasonable suspicion of what crime? Right, so... No, I'm asking you. Yes, yes. What crime? So in that particular instance with the brother, we cite in our brief, it's in a footnote, but there are laws that talk about if people are coming into the country as an unregistered agent of a foreign power, right, so if you're coming into the country and you're going to be doing things on behalf of a foreign intelligence service, you're required to register with the Attorney General. If you don't do so, that's illegal. So the logic applied to Malik would be that he was aiding and abetting a violation of that? Yes, sir. Yes, sir. And again, and I think we say this in the brief, we're not, you know, it could be unknowingly even, right? We just don't know. And we say in the brief, there's the possibility that, okay, this person is seeking to enter the country with you. He's going to be hosted by you. So either knowingly or unknowingly, perhaps, you know, there's a, you know, you're assisting in that. And certainly your information about, you know, is relevant because it's connected to the brother. So all that is a long-winded way to say that CBP, I think, as the district court concluded, had ample reason to sort of satisfy the low bar of reasonable suspicion that there was some activity, you know, possibly in violation of these border-related laws that CBP is charged with enforcing. In my remaining time, I'd like to just very briefly touch this issue that Mr. Petty alluded to about the two hours of downloading. What that refers to, and it's discussed, I don't think it's really raised very much in the opening brief on appeal, but at page 1092 in the record is our summary judgment brief, and we go into this in some detail. What really is at issue here is there was a roughly two-hour window while Mr. Malik was in the customs inspection area. He'd been interviewed by an officer. He'd been asked to place his phone and the other contents of his pocket on the table. The phone was locked, so nobody had access to it, but it was sitting on a table in the interview room. And I think, you know, nobody from CBP says that Mr. Malik at that time was sort of free to just take off and leave. So the phone was there. During this time, Mr. Malik was left alone for a while because the officers were interviewing his brother. They were doing the inspection of the brother's phone. So there's a period of time where Mr. Malik's alone in that room with the phone. At some point, an officer comes back and ultimately says, okay, now we've, at this point, we've looked at your brother's phone. We've seen what's on the phone. I don't know that they told this to Mr. Malik, but at this point, they had looked at the brother's phone. They made the decision to detain the phone. The phone is taken. It's given to another officer to basically log into storage. And at that time, the officer pulls out the battery to turn the phone off. And so that's when the phone is actually disconnected from the network. So there is an approximately two-hour window there where the phone, in theory, was still, could receive text messages. And this is on like a Sunday night. What we said is, one, it was reasonable for the government to do what they did in terms of when they disconnected the battery. There was a lot going on that night, and they were not like purposely just leaving the phone on in order to continue receiving information. More importantly, there was never any evidence submitted to the district court that there was actually specific like privileged emails or text messages that were downloaded onto the phone during that time. We asked about this in discovery, starting at page 1163 in the record. And Mr. Stoltz, there just is no information during this window, but it's really not an issue. With that, I thank the court for its time, and we ask that the court affirm. All right. Thank you, Mr. Stoltz. Mr. Petty for your vote. So tell us about the litigation in D.C. that was referred to. What's going on there? The appellant's mother is in Pakistan, and she is afraid to return to the United States, not just because of this litigation, but because of what happened to Mr. Malik after this litigation started. He was handcuffed. He was roughed up in Miami. A lot of, not a lot, but some of the privileged documents that were seized by the government and reviewed by the government relate to a business or businesses that the appellant's mother had set up. And so she filed a lawsuit against DHS and against CBP to try to get the expungement of her information, of her data. Is it brought only by her? She is the only plaintiff, yes, Judge. And Mr. Malik filed that suit. He withdrew, and I took over as counsel on that lawsuit. And what we hope to establish by that is that the government has the documents of the mother, and we're hoping to get the mother's information expunged. And that is important principally because of the issues that we raised regarding Widen I and Widen II. Widen I says that the government has offloaded data of the government to a nonprofit agency under the supervision of the Attorney General. Widen II says that the government has databased approximately a little bit less than 10,000 cell phones per year. But what's unknown is where is that information databased? And regarding our exchange regarding the USBs, there is a perfect tie between our claim regarding the USBs and the government. We know that the government has at least four media devices. The government says in the declaration of CBP Chief Paquano that CBP provided two of those USBs to Houston. CBP no longer possesses the data, and CBP never transferred that data to a law enforcement agency. So certainly when we heard about Widen I, it clicked. We believe that the government transferred those two USBs not to a governmental agency, but to an organization like TRAC, a nonprofit agency, under the supervision of the Arizona Attorney General, something that was completely not addressed during discovery. And the reason why it was not addressed during discovery is because it would not be reasonable to believe that CBP or DHS would be taking legitimately or illegitimately seized information and providing that to a nonprofit agency. Certainly that would violate the Privacy Act. And so with those two pieces together, the Widen letters and the missing data, we believe that the answer may be through, may be obtained through additional discovery. Could you address the, your time's ticking, his site referenced the Abador decision, or your lack of standing in as much as they only have a retention policy because of your law? First of all, Judge, we did not ask that they, first of all, we did not ask that they decrypt the data. We made our litigation hold request on the encrypted data. They decrypted it despite the fact that we were asking the judge to appoint a special master to review that data. And then it appears that they distributed that data throughout the agency, and it appears that they now have two missing USBs. Now, regarding Abador, and Judge, I would not have any information on that at the moment. Go ahead. But Judge, what is highlighted here by the government statement is that there are factual questions. We provide, and this case came from a summary judgment. And so all the inferences regarding those factual questions should have been resolved in the favor of the appellant. But we're hearing today about a discussion that perhaps what happened with the brother justified the search when we provided information to the district court, statement of the CBP chief saying that nothing regarding the brother justified the search. We have a factual issue that should have been decided on by the district court. That is one of the reasons why we asked this court to perhaps avoid the central issue of whether you have to have a warrant or reasonable suspicion on the cell phone, but remand to the district court to consider the issues that were overlooked, to consider the factual issues in favor of the government, and to allow discovery unwinding. And I'm out of time. Thank you.